UNITED STATES DISTRICT COURT          SOUTHERN DISTRICT OF TEXAS

| | | |
|---|---|---|
| Petroleum Pipe Americas Corp., | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| *versus* | § | Civil Action H-07-2210 |
| | § | |
| Jindal SAW, Ltd., | § | |
| | § | |
| Defendant. | § | |

## Findings of Fact and Conclusions of Law

1.   *Parties.*

Jindal SAW, Ltd., makes seamless-steel pipe in its mill in Nachik, India. Petroleum Pipe Americas Corporation distributes steel pipe it buys from mills to users in the oilfield.

2.   *Relationship.*

From November 2004 through August 2005, Petroleum Pipe Americas Corporation placed six purchase orders with Jindal for three grades of pipe. The first five purchase orders were designated to be free on board at Mumbai – FOB-Mumbai. The sixth order – number 713 – was designated cost and freight to Houston – CFR-Houston. In each order, Petroleum required a third party-inspection of the pipe by Det Norske Veritas. Det Norske Veritas, a Norwegian foundation, inspected the pipe in the mill.

In the fall of 2005, two of Petroleum's customers reported that wells had failed, they believed, because the Jindal pipe was defective. When a third customer complained of a well failure, Petroleum suspended its purchase orders, and it and quarantined its P110-grade pipe from Jindal. Petroleum then inspected the pipe it had in Houston and told Jindal that it had discovered flaws.

From October of 2005 to December of 2005, the parties met in Houston and in India to resolve the dispute. In late October, Petroleum audited Jindal's mill. The audit identified problems with Jindal's quality-control measures. They settled on January 9, 2006.

3.    *Settlement.*

The settlement released claims against all pipe that Petroleum had received by December 12, 2005, and outlined a future relationship between the Petroleum and Jindal. First, Petroleum agreed to accept delivery of the pipe remaining under orders 708 and 713. The balance of those two orders was: (a)  636.062 metric tons Jindal had made but not delivered, and (b) 2,174 metric tons Jindal had not yet made. In return, Jindal agreed to credit Petroleum $200,000 against those balances. Next, Jindal agreed to credit Petroleum $599,253 against future purchases of 6,000 metric tons of pipe. Under the settlement, Petroleum had the option but not the obligation to purchase an additional 6,000 metric tons of pipe. Last, Jindal paid Petroleum $550,000.

4.    *Aftermath.*

Petroleum apparently immediately regretted the settlement. Knowing that the buyer has the responsibility to show that the goods are defective, it continued to test and re-test the pipe in its possession. It did not report its findings to Jindal, preferring instead to keep the results "in house." No test Petroleum used was able definitely to measure the quality of the pipe. Jindal maintained that its pipe was not defective. Petroleum was still anxious, but it acknowledged seven months after the settlement that "as [we have] no proven test to prove the material is good, we do not intend to expose ourselves to future losses in marketing" Jindal pipe.

Petroleum knew that the settlement obliged it to accept the rest of orders 708 and 713. In April of 2006, knowing that its commitment subsisted, Petroleum asked Jindal to find another buyer for the 600 metric tons that had been made and was awaiting shipment. In July of 2006, Petroleum offered to return Jindal's $200,000 credit for those orders – another sign that it knew that it was responsible for orders 708 and 713. By its actions, Petroleum reconfirmed its commitment in the settlement to accept the balance under 708 and 713.

Ultimately, Petroleum refused to accept delivery of the 2,810 metric tons of pipe remaining under orders 708 and 713. Later, Jindal sold as scrap the 636.062 metric tons it had already made, incurring a loss of $623,024.42. Jindal's damages for the remaining 2,174 metric tons of unmade pipe were $805,860.

5.      *Release.*

The settlement agreement is abysmally written, but it is not ambiguous.

Petroleum released all claims that it may have had against Jindal for pipe it had received by December 12, 2005. The contract says:

> Petroleum will not raise any claim against the claimed rejection in their internal inspection carried out on any other material bought by Petroleum from Jindal. This clause relates only to material received up to 12 December 2005. Petroleum reserves the right to bring claims for claimed material received after this date.

Petroleum has insisted that it released its claims for faulty pipe only after it had been re-inspected in Houston. Petroleum's position would render the second and third sentences useless; its interpretation would have no deadline for it to reject pipe in its possession before December 13. No fully informed, disinterested person would read the settlement to allow an indefinite time for the rejection of goods already delivered. Critically, Petroleum had inspected all of the pipe that it had received by the deadline. Det Norske Veritas as Petroleum's agent had inspected the pipe in India. Petroleum released claims it had for defective pipe that it had received by December 12, 2005.

Petroleum released Jindal for pipe it delivered to Mumbai by December 12, 2005. Because the pipe was shipped FOB-Mumbai or CFR-Mumbai, title passed from Jindal to Petroleum in Mumbai. When goods are shipped free on board, title passes to the buyer at the delivery port – Mumbai. When goods are shipped CFR – cost and freight – the seller pays the costs and freight to transport the goods to the delivery port, but title passes to the buyer when the goods pass the ship's rail at the loading port in Mumbai. Consequently, in addition to the pipe that had already arrived in Houston by the deadline, Petroleum released it claims for pipe that had been loaded aboard ship in Mumbai by December 12. The delivery term is to Petroleum not to Houston.

6.      *Unreleased Claims.*

Only two shipments left Mumbai after December 12, 2005. These were for L80 grade pipe. They were delivered to the vessel on December 24 and 26, 2005. Petroleum did not release claims it may have had against this pipe.

To establish a claim against this pipe, however, Petroleum must show that pipe from those shipments was defective. ThyssenKrupp managed Petroleum's inventory in Houston; its competent and knowledgeable representative testified about its record-keeping, including its method of tracking pipe tested for flaws. At the trial, Petroleum traced pipe it believed to be defective to its purchase order, but it could not trace the pipe it believed to be defective to a particular voyage. Because it did not connect the supposedly flawed L80 to a particular voyage from Mumbai, Petroleum did not prove that Jindal had breached the settlement agreement. Even if the court assumes Jindal's post-settlement pipe was defective, Petroleum was unable to prove damages relating to its unreleased claims.

7.   Conclusion.

This is a case about a company's unhappiness with the deal it made to settle an earlier dispute. Petroleum breached the contract by not accepting the remainder of purchase orders 708 and 713. Jindal did not breach the settlement because Petroleum did not show that the pipe delivered to it after the December 12, 2005, was defective. After applying the $200,000 contractual credit, Jindal SAW, Ltd., will take $1,228,884.42 from Petroleum Pipe Americas Corporation.

Signed on August 22, 2011, at Houston, Texas.

Lynn N. Hughes
United States District Judge